## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**IN THE MATTER OF THE SEARCH OF:**

**A RED IPHONE WITH NO IDENTIFYING NUMBERS RECOVERED FROM DELDRICK BRYANT (PHONE #1)**

**A SILVER AND WHITE IPHONE WITH NO IDENTIFYING NUMBERS RECOVERED FROM KEISEAN DAVIS (PHONE #2)**

**A WHITE IPHONE WITH NO IDENTIFYING NUMBERS RECOVERED FROM UNDER FRONT PASSENGER SEAT OF TRUCK (PHONE #3)**

Case Number:  22-mj-08233-TJJ

### APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

1. I, Jakob Blackman, a Task Force Officer (TFO) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), being first duly sworn, hereby depose and state as follows:

2. I am a law enforcement officer with the Kansas City, Kansas Police Department (KCKPD).  I started my career with KCKPD as a patrolman in October 2011. Before commencing my law enforcement career, I earned a bachelor's degree in Law Enforcement/Justice Administration from Western Illinois University and later earned a master's degree in Criminal Justice from the University of Central Missouri.  In July 2016, I became a KCKPD detective.  I worked two years in the KCKPD Gang Unit working various gang-related investigations.  I am currently assigned to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) as a task force officer (TFO).  I have investigated a variety of crimes that range from property crimes, narcotics investigations, crimes against persons, and homicides.  During my employment, I have received training and have participated in numerous investigations which led to the prosecution of suspects.  I have received training in criminal investigations and my duties include the investigation of federal firearms violations. I have also made hundreds of narcotics arrests and have been trained on the identification of illegal narcotics in the

police academy, as well as at ATF.  During my employment, I have been directly involved in numerous investigations which led to the prosecution of suspects for the unlawful use and possession of firearms.

3.  This Application and Affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

<u>IDENTIFICATION OF CELLULAR TELEPHONES TO BE EXAMINED</u>

4.  The property to be searched is three cellular telephones (referred to collectively as the **"Target Telephones"**).  The property to be searched includes a red iPhone with no identifying numbers, recovered from Deldrick Bryant (**hereinafter "Phone #1"**), (see Attachment A).  **Phone #1** is currently located at the Kansas City, Kansas Police Department Narcotic Unit and attached to a charger.

5.  The applied-for warrant would authorize the forensic examination of **Phone #1** for the purpose of identifying electronically stored data particularly described in Attachment B.

 

6.   The property to be searched includes a silver and white iPhone with no identifying numbers recovered from Keisean Davis (hereinafter **"Phone #2"**), (see Attachment A).  **Phone #2** is currently located at the Kansas City, Kansas Police Department Narcotic Unit and attached to a charger.

7.   The applied-for warrant would authorize the forensic examination of **Phone #2** for the purpose of identifying electronically stored data particularly described in Attachment B.

 

8.   The property to be searched includes a white iPhone with no identifying numbers recovered from under front passenger seat of truck (hereinafter **"Phone #3"**), (see Attachment A).  **Phone #3** is currently located at the Kansas City, Kansas Police Department Narcotic Unit and attached to a charger.

9.   The applied-for warrant would authorize the forensic examination of **Phone #3** for the purpose of identifying electronically stored data particularly described in Attachment B.

3




FACTS SUPPORTING PROBABLE CAUSE

10. The items to be seized constitute evidence and instrumentalities, in whatever form and
    however stored, relating to violations of 18 U.S.C. §§ 922(u), (i), and 2 (Burglary of a
    Licensed Firearms Dealer) (the "Target Offenses").  Based on the below facts, I have
    probable cause to believe a search of the **Target Telephones** will lead to evidence of the
    Target Offenses, as well as the identification of individuals who are engaged in the
    commission of these offenses.

11. On October 16, 2022, at approximately 12:40 a.m., the Basehor Kansas Police Department
    responded to a possible commercial burglary at Free State Gun Company located at 14500
    Parallel Road, Basehor, Kansas. Free State Gun Company holds a federal firearms license
    (FFL).  When officers arrived, they observed the front door of the business destroyed,
    allowing officers to enter the structure. When they entered the building, they observed glass
    display cases broken and numerous firearms missing.

12. The business owners were alerted by an alarm system and responded to the store. When the

owners arrived, they were able to confirm numerous firearms were stolen. After reviewing

their inventory, the owners estimated approximately 50 firearms were missing to include rifle

platforms, shotguns, and pistols.

13. Surveillance cameras were installed within the business and turned over to law enforcement.

The video from within the store revealed a white in color Ford F-150 backed up to the front

of the business. The door appeared to be destroyed from the truck. At approximatley 12:31

a.m., three individuals entered the business and were observed breaching another door

leading the suspects into the main firearms display room. Once inside the room, the three

suspects broke the display glass and began carrying firearms from the building to the white

Ford F-150. All three suspects appeared to be wearing face coverings, head garments,

sweatpants, and long sleeve hoodies. Two of the suspects appeared to be tall and one may

have been wearing a pair of glasses. One of the three suspects wasn't wearing gloves and

appeared to be a black male. After approximately two minutes, the three suspects exited the

front of the business and are believed to have fled east on Parallel Road. On October 17,

2022, at approximately 5:00 a.m., deputies with the Johnson County Sheriff's Office

responded to an alarm or possible burglary at Up in Arms guns store located at 33490

Lexington Avenue, #F, De Soto, Kansas. Up in Arms holds an FFL. When deputies arrived,

they observed the front glass door of the business destroyed. Deputies entered the gun store

and observed glass display cases broken and numerous firearms missing.

14. The business owners were alerted and responded to the store. When the owners arrived, they

were able to confirm numerous firearms were stolen. After reviewing their inventory, the

owners estimated 25 pistols were taken.

15.  Surveillance cameras were installed on both the interior and exterior of the business. The

owners of Up in Arms turned the video over to law enforcement. The exterior video showed a white Ford F-150 pull into the parking lot around 4:57 a.m. The truck appeared to pull up to the front of the store and park. The rear passenger exited the truck, walked up to the front door, and looked through the door before running back to the truck.

16. The truck was then observed backing up to the front of the business and rammed the front glass door, causing it to break. The driver and rear passenger exited the truck and entered the business. Once inside, the two suspects broke the glass display cases. The two suspects removed several handguns from the display cases and placed the firearms in the bed of the truck. Suspect 01 (Driver) appeared to be a tall thin male wearing a black hoodie, tan ball cap, face covering, light colored jeans, and white and red shoes.

17. Suspect 02 (Rear Passenger) appeared to be a tall thin male, wearing a black hoodie, face covering, light colored jeans and silver and black bottomed shoes.

18. Suspect 01 and Suspect 02 began making trips back and forth from the store to the truck carrying firearms. On one occasion, Suspect 01 ran back into the store and ran directly into the front of a metal cross beam on the front door that was still intact from the breach. Suspect 01 fell backwards but was able to maintain his balance and continued to retrieve firearms. ATF investigators believed the impact likely caused an injury to the face of Suspect 01. The tan hat from Suspect 01 fell off his head from the impact and landed on the ground inside the store. The tan hat was solid in color with an emblem on the lower corner of front of the hat.

19. At one point, Suspect 01 tossed a pistol from the display case out the front door toward the back of the white Ford F-150. The firearm struck the back rear glass of the truck causing it to break.

20. While the theft of the firearms was taking place, a third suspect wearing a white Nike hoodie

was observed on an exterior camera sitting in the front passenger seat of the white Ford F-150

21. After approximately two minutes, Suspect 01 and Suspect 02 re-entered the white Ford F-150 and all three suspects fled the area. Exterior video captured the license plate of the white Ford F-150, it displayed 319RCZ. The registration returned to a 2003 Honda Pilot in Ottawa, Kansas. The Johnson County Crime Lab responded to the scene and began processing evidence. The tan hat that fell from Suspect 01 was photographed and collected on scene.

22. On October 17, 2022, ATF investigators responded to both scenes and began the investigation with local law enforcement. After reviewing the video surveillance, ATF believed both FFL thefts were committed by the same suspects. ATF Task Force Officer (TFO) Ryan Fincher and ATF TFO Jakob Blackman set up an alert system in hopes of tracking the white Ford F-150 by license plate readers (LPR's) across the Kansas City Metropolitan area.

23. LPR's are cameras set up in various intersections throughout the metropolitan areas allowing license plates to be captured via camera and saved in a database. This tool is often used by police to geographically track suspect vehicles. The LPR alerts allow law enforcement to be notified when a certain license plate is captured by the camera.

24. On October 17, 2022, Merriam Kansas Detective Kristin Jasinski learned of the FFL burglaries and told members of law enforcement a possible suspect to consider was Benjamin Custis. Detective Jasinski assisted in past theft investigations and knew Custis was involved in a series of FFL burglaries in the past as a juvenile.

25. On October 18, 2022, TFO Blackman located a Facebook profile for Custis and began looking through some pictures Custis had recently posted before the crimes. TFO Blackman

immediately recognized numerous photographs of Custis wearing and holding a tan hat. The tan hat was solid in color with an emblem on the lower corner of front of the hat. The hat appeared to be the same hat recovered from Up in Arms on October 17, 2022. In one of the photographs posted October 12, 2022, a person wearing light-colored jeans is depicted holding the tan hat while sitting inside a white vehicle. The photo only captured the lower half of the person. The inside of the door panel was visible in the picture and appeared to be the same as the inside driver door of a 2021 Ford F-150.

26.  ATF investigators believed Benjamin Custis was likely one of the three suspects involved in the crimes. On October 18, 2022, at approximately 12:53 p.m., TFO Blackman received an LPR notification on Kansas plate 319RCZ at N. 47th Street and Parallel Parkway in Kansas City, Kansas. The notification indicated the truck was traveling eastbound on Parallel Parkway. TFO Blackman began driving toward the area in an unmarked police vehicle. At approximately 1:14 p.m., TFO Blackman observed a white Ford F-150 (hereinafter "the truck") turn west on Parallel Parkway from N. 31st Street. TFO Blackman relayed the information to ATF TFO Cole Massey and TFO Fincher. TFO Blackman followed the truck covertly to the area of N. 38th and State Avenue, Kansas City, Kansas.

27. TFO Blackman observed the rear window of the truck was wrapped in plastic, which was consistent with the rear window breaking on the White F-150 that was involved in the Up in Arms burglary the day before. The truck pulled into the McDonalds drive-thru and began to order food. Members of the KCKPD Special Operations Unit (SOU) attempted to contact the vehicle utilizing a marked patrol vehicle in front and behind the truck at the drive-through window. As police officers made contact, the truck reversed and struck a parked car before fleeing east on State Avenue.

28. TFO Blackman began following the truck and relayed the information. A few minutes later, aerial surveillance was able to locate the truck around the 1300 block of State Avenue. ATF investigators began covertly following the truck as the truck traveled out of Kansas City, Kansas and into Kansas City, Missouri.

29. The truck was tracked via aerial surveillance to the 4500 block of East 75th Terrace, Kansas City, Missouri. Members of the Kansas City, Missouri Police Department Tactical Unit moved in and attempted to stop the truck. Officers were able to move in and apprehend three individuals. The driver was identified as Benjamin P. Custis, the front passenger was identified as Deldrick L. Bryant, and the rear passenger, who fled from the truck, was identified as Keisean Davis. Custis had visible scabs from an injury between his eyes and on his upper lip.  I believe this injury was caused from Custis striking the cross beam at Up in Arms the day before.

30. **Phone #1** was located on Deldrick Bryant's person. **Phone #2** was located on Keisean Davis's person. **Phone #3** was found under the front passenger seat in the truck. **Phone #3** had a visible wallpaper photo with a picture of Benjamin Custis. It was later learned the truck was reported stolen from Topeka, Kansas.

31. Numerous firearms were observed in plain view on the rear passenger floorboard of the white Ford F-150. Members of ATF took photographs and collected the firearms in plain view. They included the following firearms:

    - Glock, Model 48 .9MM pistol, with serial number BUKG086; Stolen from Up in Arms in De Soto, Kansas

    - Glock, Model 19 .9MM pistol, with serial number BWRN979; Stolen from Free State Gun Company, Basehor, Kansas. An interstate nexus expert with the ATF determined

this firearm was not manufactured in Kansas and so necessarily traveled in interstate nexus prior to arriving to Free State Gun Company.

- Free State Gun Company Model FS-15, multi-Caliber rifle with serial number 1005; Stolen from Free State Gun Company, Basehor, Kansas

- Glock, unknown model, .9MM pistol, with serial number BUFW970; Stolen from Free State Gun Company

32.  Benjamin P. Custis was interviewed by TFO Blackman and TFO Fincher. Custis was read his Miranda warnings and provided a statement. According to Custis, he purchased the truck from a person a day ago in Kansas City, Missouri and he has never been to De Soto or Basehor, Kansas. According to Custis, he was at his girlfriend's house in Osawatomie, Kansas during the dates of the crimes and was not involved. Custis also claimed he was homeless and did not know the other two individuals well and was only giving them a ride. TFO Blackman asked Custis about his facial injuries and Custis claimed his lip injury came from the police arrest and the scab between his eyes must have come from him being drunk or "high."

33. Keisean Davis was interviewed by TFO Blackman and TFO Fincher. Davis was read his *Miranda Warnings* and provided a statement. According to Davis, He was picked up by Custis and Bryant earlier in the white Ford F-150 because he knew someone who could sell them marijuana. Davis thought Bryant and Custis resided together at Bryant's house in Kansas City, Kansas. Davis said he saw the guns in the truck and touched the firearms, but claimed the firearms weren't his. Davis went on to say he was with his mother over the weekend, and she could account for him being home. Davis ensured he had nothing to do with a gun store burglary and has never been to Basehor, Kansas or De Soto, Kansas. TFO

Blackman later spoke with Davis's mother who said Davis was home in the early morning hours of October 16 but was unsure as to his whereabouts on October 17.

34. Davis further stated that Deldrick Bryant texted him photographs of some firearms and Davis was planning on purchasing the camouflage rifle that was found in the truck, but never did. Davis said the messages would be in his phone.

35. Deldrick L. Bryant was interviewed by TFO Blackman and TFO Fincher. He was read his Miranda warnings and invoked his right to remain silent.

36. Following the interviews, TFO Blackman, TFO Fincher and ATF Special Agent (SA) Clint Westgate responded to Deldrick L. Bryant's residence located at 6623 Wood, Kansas City, Kansas. They contacted Bryant's grandmother who said Bryant did reside at the residence with her. She went on to say he stays in the basement of her house, and she has access to the basement. TFO Blackman explained the crime being investigated to Bryant's grandmother. Bryant's grandmother said she had seen the white truck at her house and knew Bryant hung around the male who usually drove the truck. It was learned from other family members of Bryant's that the male who drove the white truck goes by the moniker, "Lash." "Lash" is the known moniker of Benjamin P. Custis. Members of Bryant's family had seen Custis in the past and knew what he looked like. TFO Blackman was able to confirm with family that the person the family has seen at the house was Custis and Custis drove the white truck.

37. Bryant's grandmother signed a consent to search the basement, the backyard, and a shed in the backyard of the address. TFO Blackman located a tan purse in a basement closet containing 12 pistols. All the pistols in the bag were stolen from Free State Gun Company or Up in Arms gun store.

38. On October 20, 2022, the Independence, Missouri Police Department (IPD) responded to a

shooting and located a victim suffering from gunshots. They were able to arrest the subject who was identified as Tayvion Howard. Howard was in possession of seven firearms, to include four guns reported stolen from Up in Arms gun store in De Soto, Kansas and one gun reported stolen from Free State Gun Company in Basehor, Kansas.

39. IPD detectives interviewed Howard and during the interview, it was learned additional stolen firearms were in the basement of 7900 Virginia, Kansas City, Missouri. Detectives believed the home belonged to Jaden Chaney, who was affiliated with Custis.

40. On October 20, 2022, members of the ATF served a federal residential search warrant at 7900 Virginia, Kansas City, Missouri. Jaden Chaney was not home during the warrant service, but ATF investigators located an additional eight firearms in the basement of the residence that were reported stolen from Free State Gun Company in Basehor, Kansas.

41. Based on my training and experience, I believe cellular phones, especially iPhones, must be powered on and charged for their contents to be downloaded. Once a cellular phone loses power and shuts off, the information from the phone can be lost and not recovered unless law enforcement was able to obtain a passcode, or the phone was not locked. Quick recovery of the contents of a cellular phone that is linked to criminal activity is essential and vital to criminal investigations to prevent the destruction of evidence upon powering down the phone.

42. Based upon the aforementioned facts, I believe seized **Target Telephones** contain data and information that will constitute evidence of burglaries of federally license firearms dealers in violation of Title 18, United States Code, Sections 922(u), 924(i)(1), and 2

43. I know that retrieving names, and the respective phone numbers associated with them, would assist in further identifying relationships and identities of subjects associated with this investigation.  Based upon my training and experience, examining data stored on cellular telephones can uncover, among other things, evidence that reveals or suggests who possessed or used the device, how the device was used, the purpose of its use, and when it was used.

## REQUESTED AUTHORIZATION

44. At the time of the presentation of this Application and Affidavit, the **Target Telephones** are located and secure at the Kansas City, Kansas Narcotic Unit, within the District of Kansas. Pursuant to Federal Rule of Criminal Procedure 41(b)(2), the **Target Telephones** may be moved outside the District of Kansas for the purpose of executing the search warrant.   I hereby request the Court's permission to conduct a full and complete forensic examination of the **Target Telephones**. This exam includes a search of contact lists, calendars, stored image and video files, internet history, location data, SMS and MMS text messaging, and other data related to the investigation (see Attachment B).

45. Based on my training, experience, and discussions with a certified Cellebrite cellphone examiner, I know the capabilities and limitations of the Cellebrite Universal Forensic Extraction Device (UFED). I know UFED is a forensically sound extraction tool that is used by forensic examiners to gain access into cellular devices to conduct a forensic investigation. Although highly effective, UFED occasionally encounters cellular devices that cannot be accessed.  In cases when UFED cannot access a cellular device, other forensic tools can be used such as GrayKey, which can be effective in accessing the target device. With the ever-changing world of technology and with how rapidly new cellphones are produced by a number of cellular telephone manufacturers not all cellular telephones are able to be fully

downloaded by the Cellebrite UFED device.  I know that, based on compatibility, some cellular telephones are able to be downloaded but the data that is extracted may not be complete.  Additionally, with the countless number of available applications available for cellular telephones, newer applications installed on the phone may not be recognized by Cellebrite, therefore the data will not be extracted.

<u>TECHNICAL TERMS</u>

46. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.  Wireless telephone: A wireless telephone (or mobile phone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books" or "contacts" lists; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b.  GPS:  A GPS navigation device uses Global Positioning System to display its current

location.  It often contains records of the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System consists of multiple satellites orbiting the earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

c.  IP Address:  An Internet Protocol address (or simple "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

d.  Internet:  The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

e.  Geotagging:  Geotagging is a feature that geographically tags the location and time of a photograph taken.  The data saved at the time the image is captured is usually placed in a JPEG file using the exchangeable image file format (EXIF).  The metadata within the EXIF is then readable by numerous photo editing software programs.  Simply defined, metadata contains data that describe a file.  In the case of EXIF metadata, it is data that describes data used by digital cameras, digital imaging software, and others to describe the particular attributes of a digital image file.  The tagging information is added to photographs or video at the time it is taken if the geotagging tool is enabled in the camera settings.  Programs such as Google Maps can be used to track the location a photograph or video was taken using the metadata encoded in photograph or video.

47. Based on my training, experience, and research, I know the **Target Telephones** have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, a computer, and PDA.  In my experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

ELECTRONIC STORAGE AND FORENSIC ANALYSIS

48. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensic tools.

49. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a

storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the filed does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

50. There is probable cause to believe that things that were once stored on the **Target Telephones** may still be stored there, for at least the following reasons:

    a.   Deleted files, or remnants of deleted files, may reside in free space or slack space— that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    b.   Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

    c.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

51. *Forensic evidence.*  As further described in Attachment B, this application seeks permission

to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Target Telephones** were used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the **Target Telephones** because:

    a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and sequence in which they were created.

    b.   Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

52. *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Target Telephones** consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

53. *Manner of execution.*  Because this Application and Affidavit seeks only permission to examine a device already in law enforcement's possession, the execution of the warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

# **CONCLUSION**

54. Based on the foregoing, my training and experience, and the evidence gathered in the course

of the investigation, I believe there is probable cause for a search warrant authorizing the

examination of the **Target Telephones** described in this Application and Affidavit and

Attachment A, incorporated by reference herein, to seize the items described in Attachment

B, which is property that constitutes evidence and instrumentalities, in whatever form and

however stored, relating to violations of 18 U.S.C. §§ 922(u), (i), and 2 (Burglary of a

Licensed Firearms Dealer) (the "Target Offenses").

I declare under penalty of perjury that the foregoing is true and correct.

_____
Jakob Blackman
TFO Bureau of Alcohol, Tobacco, Firearms & Explosives

Sworn and attested by affiant via telephone, after being submitted to me by reliable electronic

means on this 25th day of October, 2022.

_____
HONORABLE TERESA J. JAMES
United States Magistrate Judge

## ATTACHMENT A

1. A red iPhone with no identifying numbers recovered from Deldrick Bryant (**Phone #1**). **Phone #1** is currently located at the Kansas City, Kansas Police Department Narcotic Unit and attached to a charger.

 

   This warrant authorizes the forensic examination of the **Phone #1** for the purpose of identifying the electronically stored information described in Attachment B.

2. A silver and white iPhone with no identifying numbers recovered from Keisean Davis (**Phone #2**).

    **Phone #2** is currently located at the Kansas City, Kansas Police Department Narcotic Unit and attached to a charger.

 

 This warrant authorizes the forensic examination of **Phone #2** for the purpose of identifying the electronically stored information described in Attachment B.

3.  A white iPhone with no identifying numbers recovered from under front passenger seat of truck (**Phone #3**).  **Phone #3** is currently located at the Kansas City Kansas Police Department Narcotic Unit and attached to a charger.

 

This warrant authorizes the forensic examination of **Phone #3** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

All records, data and information on the listed cellular telephones **(Target Telephones)** described in the Application and Affidavit relate to violations of Title 18, United States Code, Sections 922(u), 924(i)(1), and (2) and probable cause exists to believe the information and items listed herein will be found secreted in the **Target Telephones**, including:

a.      Contact information, incoming and outgoing call information, pictures, videos, stored voicemail and text messages.

b.      Any information related to selling or purchasing firearms (including names, addresses, phone numbers, or any other identifying information).

c.      Device ownership and user information, including evidence of user attribution showing who used or owned the **Target Telephones** at the time the things described in the warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

d.      Photographs, images, and videos of firearm trafficking activity, associates, instrumentalities or proceeds of firearms sales; including stored information related to the date, time, user and owner of the device, and location of the image generation.

e.      Any geotagging information such as the camera's date and time clock, make and model, serial number, and location of photographs and videos determined by the camera's Global Positioning System receiver or geotagging tool.  Including any identification information related to the use and ownership of the devices.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.